Robert V. Prongay (SBN 270796)
Casey E. Sadler (SBN 274241)
Raymond D. Sulentic (SBN 316913)
**GLANCY PRONGAY & MURRAY LLP**
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone:  (310) 201-9150
Facsimile:  (310) 201-9160
Email:        rprongay@glancylaw.com
                  csadler@glancylaw.com
                  rsulentic@glancylaw.com

*Counsel for Alejandro Handal, Steven Cardoza, and Homayon Farnoodymeher and Lead Counsel for the Class*

[Additional Counsel on Signature Page]

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| IN RE ALTERYX, INC. SECURITIES LITIGATION | CASE NO. 8:20-cv-01540 DOC (JDEx) |
|---|---|
| | **AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS** |
| | **<u>DEMAND FOR JURY TRIAL</u>** |

# **TABLE OF CONTENTS**

I.  NATURE OF THE ACTION ............................................................................ 1

II.  JURISDICTION AND VENUE ..................................................................... 3

III.  PARTIES ......................................................................................................... 3

IV.  SUBSTANTIVE ALLEGATIONS .............................................................. 5

    A.  Alteryx Portrays Itself As A Revenue Growth Story, But That Growth Is Artificially Boosted By Manipulating Revenue Following An Accounting Change .......................................................... 5

    B.  Alteryx Instructs Its Sales Force To Replace Profitable Deals With Lower Margin Contracts Over Longer Durations To Increase Near-Term Revenue ........................................................... 8

    C.  After Rip-And-Replace Opportunities Become Saturated, And Thus Unsustainable, Revenue Growth Wanes, And Defendants Try To Refocus The Market Away From Looking At Revenue Towards ARR ....................................................................................... 9

    D.  Alteryx Announces 2019 Fiscal Results And Provides 2020 Fiscal Guidance Without Disclosing The Rip-And-Replace Scheme Or ARR ............................................................................... 12

    E.  Alteryx Reports A Weak Q1 2020 ARR And Lowers Its 2020 Revenue Guidance, Partially Admitting That Revenue Growth Is Impacted By Timing, But Fails To Disclose The Full Revenue Picture ........................................................................................... 13

    F.  The Company Reveals The True Impact Of Its Rip-And-Replace Scheme ..................................................................................... 15

    G.  Only After The Company's Long-Standing CEO Is Replaced Does Alteryx Provide Metrics That Confirm Defendants Were Aware That Revenue Was Decelerating And That ARR Was Touted To Conceal This Fact .................................................... 17

V.      DEFENDANTS' MATERIALLY FALSE AND/OR MISLEADING STATEMENTS AND OMISSIONS ISSUED DURING THE CLASS PERIOD ............................................................................................ 17

    A.      Defendants' False And Misleading Statements Disseminated To the Public On February 13, 2020 ................................ 18

    B.      Defendants' False And Misleading Statements Disseminated To the Public On February 24, 2020 .............................. 22

    C.      Defendants' False And Misleading Statements Disseminated To the Public On May 6, 2020 ...................................... 23

VI.     LOSS CAUSATION ........................................................................ 27

VII.    ADDITIONAL SCIENTER ALLEGATIONS ............................... 31

    A.      The Individual Defendants Profited Handsomely From Selling Alteryx Shares At Inflated Prices ........................... 31

    B.      Longstanding Executives Directly Involved In The Scheme Were Removed From Their Position Following Its Disclosure And Company Only Revealed ARR After The CEO's Removal .............. 33

    C.      Alteryx's Sales Of Its Web Services Were The Company's Core Operations ............................................................. 34

    D.      The Company's Accounting Firm Is Replaced Just As The Accounting Rule Changes That Enable Defendants' Scheme Come Into Effect ................................................. 35

    E.      CORPORATE SCIENTER ALLEGATIONS ....................... 35

VIII.   CLASS ACTION ALLEGATIONS ................................................ 35

IX.     UNDISCLOSED ADVERSE FACTS ............................................ 37

X.      APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE) .................................................. 38

XI.   INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE ........................................................... 40

XII.  CLAIMS ........................................................................................................ 41

XIII. PRAYER FOR RELIEF ................................................................................ 45

XIV.  JURY TRIAL DEMANDED ........................................................................ 46

Lead Plaintiffs Alejandro Handal, Steven Cardoza and Homayon Farnoodymeher (collectively, "Plaintiffs"), bring this Amended Class Action Complaint against Alteryx, Inc. ("Alteryx" or the "Company"), Dean A. Stoecker ("Stoecker") and Kevin Rubin ("Rubin") (together, "Defendants"). The allegations herein are based on Plaintiffs' personal knowledge as to their own acts and on information and belief as to all other matters, such information and belief having been informed by the investigation conducted by and under the supervision of Lead Counsel, which includes a review of: U.S. Securities and Exchange Commission ("SEC") filings by Alteryx; securities analysts' reports and advisories about the Company; press releases and other public statements issued by the Company; media reports about the Company; interviews with former Alteryx employees; and other publicly available information concerning Alteryx. Lead Counsel's investigation into the matters alleged herein is ongoing, and many relevant facts are known only to, or are exclusively within the custody or control of, Defendants. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. On behalf of themselves and the class they seek to represent, Plaintiffs allege as follows:

# I.  NATURE OF THE ACTION

1. This is a federal securities class action on behalf of persons or entities who or which purchased or acquired Alteryx securities between February 13, 2020 and August 7, 2020, inclusive (the "Class Period") and were damaged thereby, seeking to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act").

2. This is a straightforward case of securities fraud. Knowing that investors and analysts were focused on the Company's sustained revenue growth, Alteryx artificially propped up its stock price by inflating its revenue through a practice called "rip and replace," where Alteryx had existing customers enter into longer term deals at a lower price. Restructuring existing contracts in this way

exploited a recent change in accounting rules to recognize more immediate revenue on Alteryx's financial statements and maintain the appearance of revenue growth. This practice, however, was unsustainable because it relied on taking future periods' revenue and booking it in the present.  As such, Defendants knew that their restructuring practices created a looming revenue cliff that hung over the Company's future.

3.    For a while, Defendants' scheme was incredibly successful.  Alteryx's high stock price resulting from these inflated revenues enabled Defendants Stoecker and Rubin to sell their Alteryx stock for more than **$120 million** from the beginning of 2019 through the end of the Class Period and more than **$72 million** during the Class Period.

4.    Defendants realized that their continued revenue growth was unsustainable, so they made the conscious decision to shift the focus of investors and analysts away from revenue.  As such, when revenue began to materially decelerate, Defendants began to tell the market that it should consider Annual Recurring Revenue ("ARR"), a non-GAAP[1] metric, as most indicative of the Company's future performance.  This was done to prevent investors from realizing that the Company was cannibalizing its long-term future for short-term gains in revenue.  However, even though Defendants were initially successful in muting the impact of deteriorating revenue by focusing investors on ARR, the Company was unable to prevent the stock from cratering when the true impact of the "rip-and-replace" scheme came to light.

5.    Defendants acted with scienter and must be held accountable for their wrongful acts and omissions which, as the true facts came to light, were the cause of a significant decline in the market value of the Company's stock.  Plaintiffs and other Class members have suffered significant losses and damages at the hands of

---

[1] GAAP refers to Generally Accepted Accounting Procedures.

Defendants and are entitled to redress.

**II.     JURISDICTION AND VENUE**

6.     The claims asserted here arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) & 78t(a)) and Rule 10b-5 promulgated  by the SEC (17 C.F.R. § 240.10b-5).

7.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

8.     Venue is proper in this Judicial District under 28 U.S.C. §1391(b) and Section 27 of the Exchange Act (15 U.S.C. §78aa(c)).   Substantial acts in furtherance of the alleged securities law violations, and/or the effects of the violations, occurred in this Judicial District.  Many acts charged herein, including the preparation and dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District.  In addition, the Company's principal executive offices are in this District.

9.     In connection with the acts, transactions and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the U.S. mails, interstate telephone communications, and the facilities of a national securities markets.

**III.    PARTIES**

10.    Plaintiffs, as set forth in their previously filed certifications, incorporated by reference herein (Dkt. No. 19), purchased Alteryx securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

11.    Defendant Alteryx is incorporated under the laws of Delaware with its principal executive offices located at 3345 Michelson Drive, Suite 400, Irvine, California. Alteryx's Class A common stock trades on the New York Stock Exchange under the symbol "AYX."

12.   Throughout the Class Period, Alteryx, through its officers and directors, published periodic filings with the SEC and made public statements that, as alleged herein, contained material misrepresentations and omissions that artificially inflated the price of the Company's shares.

13.   Defendant Stoecker was the Company's Chairman and Chief Executive Officer ("CEO") from its founding in 1997 until his separation from the Company on October 5, 2020, when he was replaced by current CEO, Mark Anderson.  Before co-founding Alteryx, Stoecker held various sales and business leadership roles at Strategic Mapping and Dun & Bradstreet.   Stoecker earned his MBA from Pepperdine University and his undergraduate degree in international business from the University of Colorado, Boulder.

14.   Defendant Rubin was, at all relevant times, the Company's Chief Financial Officer ("CFO"). Rubin, a CPA (inactive), began his career at Arthur Anderson, serving technology clients of similar size to Alteryx, for seven years. Before joining Alteryx, Rubin was chief financial officer of MSC Software, a private equity-backed software company.  Prior to MSC Software, Rubin served as chief financial officer for Pictage, a venture-backed Software-as-a-Service (SaaS) provider; DataDirect Networks, a data storage equipment provider; and MRV Communications, a publicly traded telecommunications equipment provider.  He holds a bachelor's degree in business economics with an emphasis in accounting from the University of California, Santa Barbara.

15.   Defendants Stoecker and Rubin (collectively the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market.  The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and

opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were actively concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.  The Individual Defendants are liable for the misrepresentations pleaded herein.

16.    Throughout the Class Period, the Individual Defendants often spoke to investors and analysts on conference calls and at investor conferences. Both Individual Defendants possessed the power and authority to control the contents of the Company's public filings with the SEC. During the Class Period, both Individual Defendants signed or authorized the signing of and certified the accuracy of Alteryx's Quarterly Reports.

## IV.    SUBSTANTIVE ALLEGATIONS

17.    Alteryx is a data analytics company that offers a subscription-based platform for customers to access, prepare, and analyze data from a multitude of sources, and then deploy and share analytics at scale to make data-driven decisions. Essentially, it purports to be a software company that makes data analysis for business entities more efficient and streamlined, so that corporate managers at those entities can focus on running their business, rather than figuring out how to analyze data.

### A.    Alteryx Portrays Itself As A Revenue Growth Story, But That Growth Is Artificially Boosted By Manipulating Revenue Following An Accounting Change

18.    Generally Accepted Accounting Principles ("GAAP") are the conventions, rules, and procedures necessary to define accepted accounting practices at a particular time and against which financial presentations should be measured. GAAP are the official accounting standards codified and primarily

promulgated by the Financial Accounting Standards Board ("FASB").   The conceptual framework for financial accounting and reporting rules is set forth in the Statement of Financial Accounting Concepts ("FASCON") promulgated by the FASB.

19.   FASB revised its Accounting Standards Codification provision for revenue from ASC 605 to ASC 606 effective at the end of 2018.   This revision enabled Alteryx to greatly increase the appearance of revenue growth—but for new contracts only— by allowing Alteryx to aggressively pull-forward revenue from future periods into the present.   For example, if Alteryx has a client willing to enter a three-year contract at $100 per year ($300 total value contract), under ASC 606, the Company would recognize $120 as revenue immediately.   Then, the remaining $180 of the total would be recognized over three years, or $60 per year of additional revenue on top of the immediate $120 recognition.   Therefore under ASC 606, the Company could recognize $180 in the first year.   By contrast, under ASC 605, the Company could just recognize $100 in the first year as revenue could only be recognized linearly over the contract term (*i.e.* either $8.33 per month ($300/36 months ) or $100 per year ($300/3 years)).

20.   The difference is even more pronounced during the first quarter when the contract is signed.   For instance, under ASC 605, just *8.3%*[2] of the contract's value would be recognized as revenue during the quarter of signing.   By contrast, under ASC 606, as much as *45%* is booked as revenue during the first quarter.[3]

---

[2] Calculated as follows: The $300 notional value contract is recognized at $8.33 per month, or $25 for a quarter.   $25 divided into $300 equals 8.3%.

[3] Calculated as follows: 40% of the $300 notional value contract is recognized immediately (.40 x $300 = $120).   Then, the remaining $180 is recognized in the periods when the amount is billed, at $5 per month ($180 / 36 months). That means on top of the initial $120 being booked immediately, an additional 3 months', or $15 of revenue, or $135 is booked in the first quarter.   $135 divided into $300 equals 45%.

21.   It also means that, if no additional contracts are signed, then the last period of the contract will show a sharp decline in revenue under ASC 606, or a revenue cliff.  For instance, if $180 of the hypothetical $300 contract is recognized in the first year ($120 immediately, $60 over the next 12 months), then the third year will show just $60 in reported revenue.  Thus, as contract expiration approaches, new contracts are needed, or revenue significantly declines.    By contrast, under the old rule, contracts that were "ripped and replaced" would create no such revenue anomalies since revenue was recognized linearly.

22.   The table below compares how a $300 contract, with a 3-year term, payable at $100 per year would appear as revenue under ASC 606 and under the old rule ASC 605.  Because ASC 606 allowed for front-loading, it made a "rip and replace" scheme a highly effective means of boosting the appearance of revenue growth at a SaaS company even when actual sales growth was flagging.

| | At contract signing | FY 1 | FY 2 | FY 3 | Total |
|---|---|---|---|---|---|
| Revenue recognized under **ASC 606** | $120 | $180 | $60 | $60 | $300 |
| *Percent of total contract recognized as revenue* | *40%* | *60%* | *20%* | *20%* | *100%* |
| Revenue recognized under **ASC 605** | $0 | $100 | $100 | $100 | $300 |
| *Percent of total contract recognized as revenue* | *--* | *33%* | *33%* | *33%* | *100%* |

**B.    Alteryx Instructs Its Sales Force To Replace Profitable Deals With Lower Margin Contracts Over Longer Durations To Increase Near-Term Revenue**

23.    The Company was able to continue its growth story by sacrificing long-term revenue for short-term gain.  While Alteryx publicly discloses that it employs a land-and-expand software sales strategy—*i.e.*, focusing on sales to existing customers—to drive incremental revenue, the Company also surreptitiously employs an undisclosed rip-and-replace scheme to boost its revenue.

24.    According to CW1, a former Alteryx Director of Global Deal Desk, from April 2019 until February 2020,[4] Alteryx engaged in rip and replace by transferring existing customers into longer term deals at a lower price.[5] Restructuring the contracts in this way generates more immediate revenue on Alteryx's financial statements under ASC 606, though this comes (or will come) at the expense of future periods.

25.    In other words, rip and replace is a value-destroying proposition. In the short run, as new contracts are both signed and renegotiated, revenue will increase rapidly—because Alteryx recognizes a significant portion of revenue immediately after re-negotiating each deal.

---

[4] CW1 reported to VP of Revenue Tim Olaerts, who in turn reported to Rubin. CW1 oversaw a team of approximately twenty people responsible for approving deals (making sure the contract had the appropriate terms and signatures) and making sure bookings were accurately captured in Salesforce databases.

[5] CW1 described instances of rip and replace when sales reps approached customers, closed them on a 2-year or 3-year deal, and then shortly after signing those deals, re-negotiated just months later into another three-year contract (with the same customer) at an even lower price.

**C.** **After Rip-And-Replace Opportunities Become Saturated, And Thus Unsustainable, Revenue Growth Wanes, And Defendants Try To Refocus The Market Away From Looking At Revenue Towards ARR**

26. Unlike revenue, which can be front-loaded, ARR represents the annualized value of Alteryx's contracts *at the end of the* quarter. So using the hypothetical three-year contract example above, if Alteryx closes a 3-year deal for $300 in total contract value (payable at $100 per year), the ARR for that deal would be $100.

27. The table below compares how that $300 contract appears as revenue and as ARR. For years two and three, ARR exceeds GAAP revenue under ASC 606, assuming the contract is not renewed at any point over the three years. The highlighted cells indicate which metric shows a higher amount. In a single discrete deal, revenue is higher in the beginning, ARR is higher at the end.

|  | At contract signing | FY 1 | FY 2 | FY 3 | Total |
|---|---|---|---|---|---|
| ARR | $100 | $100 | $100 | $100 | $300 |
| Revenue under ASC 606 | $120 | $180 | $60 | $60 | $300 |

Source: Figures provided by August 20, 2020 research report by JMP Securities, quoting Alteryx SVP, Karen Moran.

28. Aided in part by the revenue change from ASC 605 to ASC 606, Alteryx reported impressive revenue growth shortly after the rule change. For instance, in Q1 2019 through Q4 2019 (the four quarters immediately following the accounting switch), quarterly revenue grew 51%, 59%, 65%, and 75% on a year-over-year basis, respectively.

29. ARR was less impressive, and even could have suggested to investors that revenue growth figures were overstated by the rip-and-replace strategy. Even

though Alteryx had provided ARR figures in the past, following the announcement that the Company would be implementing ASC 606, Defendants chose to disclose only revenue (and not ARR) figures: the former showcasing the Company in the most promising light, given the growth narrative touted to investors.

30.   This intended effect is supported by CW1, who stated that ARR was a **key metric** to understand the Company's prospects and that when revenue grows faster than ARR, it is a red flag.   Specifically, CW1 believed that because ARR growth was significantly less than revenue growth, the Company continued to focus on revenue, where it had been exceeding analysts' forecast.   That discrepancy, or red flag, is why the Company did not consistently discuss ARR, according to CW1.

31.   That Defendants were only providing the inflated revenue figures instead of the ARR figures that more accurately reflected Alteryx's financial condition was confirmed by the Company when, after the Class Period and Defendant Stoecker left Alteryx, it disclosed historical ARR by quarter.   These historical ARR figures reflect revenue growth that substantially exceeds ARR growth.   For example, revenue growth on a quarter-over-quarter basis for the 2019 fiscal third and fourth quarters was 26.1% and 50.9%, respectively, whereas ARR growth was only 6.4% and 14.3% for the same periods:[6]

---

[6] The bolded figures indicate which metric showed stronger growth.   The blue coded figures indicate when the Company resumed disclosing ARR (as ARR for Q1 through Q4 2019 was not disclosed until Q3 2020).

|  | 2019 | | | | 2020 | | |
|---|---|---|---|---|---|---|---|
|  | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 |
| GAAP Revenue | 76 | 82 | 103.4 | 156 | 108.9 | 96.2 | 129.7 |
| Year-over-Year Growth | **51%** | **59%** | **65%** | **75%** | 43% | 17% | 25% |
| Quarter-over-Quarter Growth | -14.8% | 7.9% | **26.1%** | **50.9%** | -30.2% | -11.7% | 34.8% |
| ARR | 281.9 | 306.7 | 326.3 | 372.8 | 404.9 | 432.3 | 449.5 |
| Year-over-Year Growth | 41% | NM* | NM | NM | **44%** | **41%** | 38% |
| Quarter-over-Quarter Growth |  | **8.8%** | 6.4% | 14.3% | **8.6%** | **6.8%** | 4.0% |

*NM stands for "not measurable." It is not measurable because 2Q through 4Q 2018 ARR remains undisclosed

32.     As the above table shows, while Alteryx's rapid revenue growth continued in 2019, it had greatly slowed in the beginning of the 2020 fiscal year.  In fact (and as shown below), Q4 2019 represented the high-water mark, or the edge of the revenue cliff, in Alteryx's quarterly revenue, in part because revenue that could have otherwise been recorded during later quarters had already been pulled into that period or earlier periods through Alteryx's rip-and-replace tactics.  In other words, once its revenue enhancing rip-and-replace opportunities became saturated, Alteryx needed a way to assure investors about the looming revenue drop off illustrated below:[7]

---

[7] This is confirmed by Alteryx SVP of Strategic Finance Karen Moran's disclosure on February 24, 2020 that management knew "coming into the [second] quarter" that Q2 2020 "would be challenging."



**D.     Alteryx Announces 2019 Fiscal Results And Provides 2020 Fiscal Guidance Without Disclosing The Rip-And-Replace Scheme Or ARR**

33.    On February 13, 2020, the Company announced its 2019 fiscal year and Q4 financial results.  Specifically, the Company disclosed that revenue for the fourth quarter of 2019 was $156.5 million, an increase of 75% compared to revenue of $89.2 million in the fourth quarter of 2018.  In addition, revenue for the full year 2019 was $417.9 million, an increase of 65% compared to revenue of $253.6 million for the full year 2018.  Moreover, the Company provided revenue guidance of between $105 million and $108 million, an increase of 38% to 42% year-over-year, for Q1 2020; and revenue guidance of between $555 million and $565 million, an increase of 33% to 35% year-over-year, for the 2020 fiscal year.

34.    Defendant Stoecker touted the Company's position going forward, noting that "As we head into a new decade, we believe Alteryx's unique position in the market coupled with continued favorable market trends, such as investments in digital transformation initiatives, provides significant runway for future growth."  However, nowhere in this announcement or the earnings call that same day did Defendants disclose the existence of the rip-and-replace scheme or its impact on the

Company, including that it had cannibalized long-term growth for short-term profits, and that the Company faced a revenue cliff in the future.

35.   The Company's stock increased $13.70 per share, up 9.49%, to close on February 14, 2020 at $158.00 per share, on unusually heavy trading volume.

**E.   Alteryx Reports A Weak Q1 2020 ARR And Lowers Its 2020 Revenue Guidance, Partially Admitting That Revenue Growth Is Impacted By Timing, But Fails To Disclose The Full Revenue Picture**

36.   On May 6, 2020, the Company issued a press release reporting its Q1 2020 results. Therein, the Company posted Q1 2020 revenue of $108.8 million, a 43% increase from the prior year, and gave Q1 2020 revenue guidance of between $91 to $95 million, which represented an increase of just 10% to 15% from the prior year.  Additionally, the Company withdrew its 2020 fiscal year guidance that was only provided one quarter earlier on February 13, 2020.  Moreover, the Company reintroduced ARR—a metric not previously disclosed since before the revenue accounting change—and touted that ARR exceeded $400 million for the first time "despite an abrupt and significant change in customer buying behavior later in the quarter."[8]

37.   Thereafter, the Company's share price fell $3.54, or 2.9%, to close at $118.96 per share on May 7, 2020, on heavy trading volume.

38.   When Defendants gave this new revenue guidance, they were aware of, yet failed to disclose, the material risks that their earlier revenue inflation scheme would have—and later did have—on subsequent quarters' revenue and ARR.

39.   The ARR figure itself was also inflated by Alteryx's use of adoption

_____

[8] The official story for the ARR now being disclosed was, according to Stoecker, that "we wanted to give everyone some comfort on the health of the business. . . ."

licenses.[9]  Adoption licenses are short-term contracts (often for less than one year) and are not intended to recur in the future. Including adoption licenses in ARR is misleading because the metric purports to represent *annual* and *recurring* revenue—characteristics which do not describe adoption licenses.

40.  As CW1 explained, adoption licenses became more prevalent over CW1's tenure at the Company and were a "big part of the selling promotion" overall at Alteryx. Indeed, as the Company would later admit, the use of adoption licenses would double from Q1 2020 to Q2 2020.  The increase adoption license use was an attempt to increase incremental revenue in the short term to cover for the long-term shortfall in revenue from the rip-and-replace strategy.[10]

41.  Despite Defendants' partial disclosure of weakening revenue, the combination of (a) the Company's failure to disclose a looming revenue cliff from its rip-and-replace practices, (b) Defendants' failure to provide prior quarter ARR, (which would have enabled investors to see the trend in the figure), and (c) Defendants' failure to disclose that ARR had been inflated by short-term and nonrecurring adoption licenses, collectively left investors with a misleading picture of Alteryx's prospects.  By omitting historical ARR comparators and the rip-and-replace scheme, Defendants purposefully masked Alteryx's slowdown in revenue,[11] as well as the imminent revenue cliff.

---

[9] While the Company disclosed the use of adoption licenses during Q1 2020, it did not quantify how adoption licenses impacted revenue or ARR, nor did the Company disclose that ARR includes adoption licenses.

[10] In a post-Class Period confirmation, the Company revised its definition of ARR whereby it admitted that "[b]oth multi-year contracts *and contracts with terms less than one year* are annualized by dividing the total committed contract value by the number of months in the subscription term and then multiplying by twelve."  In other words, the additional disclosure confirms that contracts with durations of less than 12 months, such as adoption licenses, are included within ARR.

[11] Again, if the Company had actually provided quarterly disclosure of ARR, investors would have been able to calculate that the ARR had been growing

42.    That Defendants misled the market is confirmed by analysts' initial reactions to Q1 2020 ARR.  For instance, Guggenheim noted that Alteryx's revenue "guide for Q2 '20 implies quite a bit of slowdown vs. Q1 '20, but we would assume that there is an element of conservatism in that guide… ***This gives us some comfort*** that the revenue and billings growth disparity could have been timing-related and ***revenue growth might not have been impacted materially by any duration tailwind***."

**F.    The Company Reveals The True Impact Of Its Rip-And-Replace Scheme**

43.    On August 6, 2020, Alteryx announced its second quarter 2020 financial results, reporting Q2 2020 revenue of $96.2 million and providing 2020 revenue guidance of $460 to $465 million, which was well below the guidance the Company gave on February 13, 2020, for 2020 revenue of $555 million to $565 million.

44.    The Company also disclosed its second consecutive quarter of ARR performance metrics.  ARR in Q2 2020 was $430.3 million, just 6% higher than the reported ARR from the prior quarter. Once analysts digested the muted ARR growth from the prior quarter, the additional disclosure revealed exactly why CW1 described early revenue growth that exceeds ARR growth as a red flag: because it indicates that the current revenue is unsustainable and not indicative of future performance whereas ARR more accurately reflects future likely revenue.

45.    On the earnings call on August 6, 2020, the Company also disclosed a doubling of adoption licenses during the second quarter, reflecting in part the Company's desperation to secure new contracts as its earlier rip-and-replace scheme

---

substantially less than revenue throughout all of 2019.  But instead of doing that, Defendants gave ARR at the first (and then only) point when ARR growth exceeded revenue growth.

had made it far more difficult for the Company to re-negotiate existing customers into longer-term deals—because they had already been locked into them.

46.   Analysts were surprised by Alteryx's Q2 2020 results, and by the Company's FY 2020 guidance. For instance, on August 7, 2020, Cowen Analyst, Derrick Wood commented that "[t]he shortfall *was very surprising*, and we expect shares to be pressured."  In fact, even though the Company tried to place blame on the pandemic,[12] one analyst (Guggenheim) wrote that the pandemic was only a contributing factor to Alteryx's GAAP revenue guide down, and something else was amiss:

> Although the disruption caused by the pandemic is a factor, we also worry about broader execution and demand challenges as *our math shows that new ARR added by the company has remained almost flat for two years in a row*, and based on its FY20 guide is expected to be flat again. We downgrade from BUY to Neutral.
>
> ***
>
> For Q2'20 AYX said its ARR was over $430m and grew 40% y/y. However, since ARR is a cumulative metric, it would be more appropriate to look at the q/q growth in ARR to get a sense of the 'new ARR' added in the quarter. ***Based on AYX's disclosure that its ARR***

---

[12] For example, the Company clearly tried to blame the pandemic for its revenue issues, stating in its 10-Q filed on August 7 that:

> During the three and six months ended June 30, 2020, we continued to experience significant changes in customer buying behavior that began in March as a result of the impact of the COVID-19 pandemic, including decreased customer engagement and delayed sales cycles. Specifically, economic challenges that enterprise customers in certain verticals have experienced, as well as weakness in our commercial segment that targets small- and medium-sized businesses, have adversely impacted the length of the sales cycle and the expansion and new business sales with these customers. As a result of these changes, we experienced a decrease in revenue from the three months ended June 30, 2020 as compared to the three months ended March 31, 2020 and deterioration in near-term demand….

*crossed $400m in Q1'20 , and its disclosure that its ARR in Q2'20 was -430m*, we calculate that "new ARR" added in Q2'20 was -$20m and was down [year-over-year] and [quarter-over-quarter].

47.     The Company's share price fell $47.62, or more than 28%, to close at $121.38 per share on August 7, 2020, on heavy trading volume, and continued to decline over the next trading session by $12.15, or 10%, to close at $109.23 per share on August 10, 2020, also on heavy trading volume.  For the two days, the stock cumulatively declined $59.77 per share, or 35.37%.

**G.     Only After The Company's Long-Standing CEO Is Replaced Does Alteryx Provide Metrics That Confirm Defendants Were Aware That Revenue Was Decelerating And That ARR Was Touted To Conceal This Fact**

48.     On October 2, 2020, after more than 20 years leading the Company, but less than two months after the truth of Defendants' revenue manipulation became known, Defendant Stoecker "resigned" as CEO and was immediately replaced by a member on the Board of Directors.

49.     Thereafter, roughly one month after Stocker's separation from the Company, on November 5, 2020, the Company disclosed its ARR in every quarter, including for historical quarters as far back as Q1 2019.  This enabled investors to calculate both year-over-year and sequential ARR growth over time, and compare that to revenue growth, which as discussed above, demonstrate that the revenue was inflated by the rip-and-replace scheme.

50.     On January 4, 2021, just a few months after Stoecker's removal as CEO, Alteryx's Chief Revenue Officer, Scott Jones, also left the Company "to pursue outside opportunities."

**V.     DEFENDANTS' MATERIALLY FALSE AND/OR MISLEADING STATEMENTS AND OMISSIONS ISSUED DURING THE CLASS PERIOD**

51.     Throughout the Class Period, Defendants were aware or were reckless in not knowing that the Company was engaged in a rip-and-replace sales scheme so

that it could immediately recognize more revenue and maintain the appearance of revenue growth, and that this scheme relied on taking future periods' revenue and book it in the present, which created a substantial, undisclosed risk to Alteryx's future revenue. Yet, they failed to disclose the true condition of the Company to the public during the Class Period.

**A.    Defendants' False And Misleading Statements Disseminated To the Public On February 13, 2020**

52.   On February 13, 2020, the Company issued a press release entitled, "Alteryx Announces Fourth Quarter and Full Year 2019 Financial Results." Therein, the Company, in relevant part, stated:

> Alteryx, Inc. (NYSE: AYX), revolutionizing business through data science and analytics, today announced financial results for its fourth quarter and full year ended December 31, 2019.
>
> "Alteryx delivered record results for the fourth quarter and the full year 2019, driven by strong execution and positive industry tailwinds," said Dean Stoecker, CEO of Alteryx, Inc. "Companies across the globe are increasingly turning to Alteryx to help drive better data-driven outcomes. As we head into a new decade, we believe Alteryx's unique position in the market coupled with continued favorable market trends, such as investments in digital transformation initiatives, provides significant runway for future growth."
>
> **Fourth Quarter 2019 Financial Highlights**
>
> - **Revenue:** Revenue for the fourth quarter of 2019 was $156.5 million, an increase of 75%, compared to revenue of $89.2 million in the fourth quarter of 2018.
>
> ***
>
> **Full Year 2019 Financial Highlights**
>
> - **Revenue:** Revenue for the full year 2019 was $417.9 million, an increase of 65%, compared to revenue of $253.6 million for the full year 2018.

\*\*\*

**Financial Outlook**

As of February 13, 2020, guidance for the first quarter of 2020 and full year 2020 is as follows:

**First Quarter 2020 Guidance:**

- Revenue is expected to be in the range of $105.0 million to $108.0 million, an increase of 38% to 42% year-over-year.

\*\*\*

**Full Year 2020 Guidance:**

- Revenue is expected to be in the range of $555.0 million to $565.0 million, an increase of 33% to 35% year-over-year.

53.   The statements in ¶52 were materially misleading when made because they omitted the following material facts necessary to make the statements not misleading: (a) that the Company was engaged in the rip-and-replace scheme to pull future revenue into earlier reporting periods, which cannibalized long-term growth for short-term profits and created a revenue cliff for the Company in the foreseeable future; and (b) undisclosed risks to future revenue from the rip-and-replace scheme made the Company's financial guidance unreasonable and without basis.

54.   On February 13, 2020, the Company held a conference call with analysts and investors to discuss its 2019 fiscal year and fourth quarter financial results.  Therein, Defendant Rubin, in relevant part, stated:

Revenue upside in the fourth quarter was due to the following factors. First, we had another quarter of strong execution. As previously mentioned, our Q4 bookings grew 81% year-over-year. Second, we closed a record number of large deals, with an over 150% growth in deals over $1 million and an over 80% increase in deals over $500,000. Third, we did see a modest sequential increase in contract duration. For

the full year 2019, our average contract duration was exactly 2.0 years.

55.    The statements in ¶54 were materially misleading when made because they omitted the following material facts necessary to make the statements not misleading: (a) that the Company was engaged in the rip-and-replace scheme to pull future revenue into earlier reporting periods, which cannibalized long-term growth for short-term profits and created a revenue cliff for the Company in the foreseeable future; and (b) undisclosed risks to future revenue from the rip-and-replace scheme made the Company's financial guidance unreasonable and without basis.

56.    During the Q&A portion of the earnings call, the impact of contract duration on revenue was specifically discussed when an analyst asked for a historical data point for comparison, yet Stoecker and Rubin failed to disclose the impact of rip-and-replace and gave an evasive response:

> TYLER MAVERICK RADKE: So you talked about the very strong bookings growth that -- in Q4 here. We obviously have revenue growth at 75%. And I appreciate the granularity on the duration of 2.0, but maybe -- *could you help us understand what duration has been at a granular level maybe a year ago* and just if there's a way to think about a duration-adjusted or annualized bookings growth for the full year of 2019 just so we can kind of help understand the impact of duration on overall bookings growth.

> STOECKER: Yes. Thanks, Tyler. So we've been talking, even as we were kind of preparing for the IPO and going through conversations, that the average contract duration has been 2 years. Obviously, that's an average. And so we thought it *would be helpful to provide a little bit more precision for 2019*. But I think the point is that going back as early as 2016, our average duration has still been in that range. Now we have seen some improvement in the back half of 2019 but not to the extent that it actually affected the averages. So in any event, I think that that at least illustrates the stability in the customer decision around duration that we've seen over 3 or 4 year*s*.

> RUBIN: Let me also add that it's an expected effect of becoming a critical component of their analytic framework in organizations. You can expect them as they see more and more value *to want to sign up*

*for longer-term deals*. Again, affirmation that the strategy we've put together for many, many years now is paying off in spades.

57.   The statements in ¶56 were materially false or misleading when made, or omitted material facts necessary to make the statements not misleading because the Individual Defendants failed to disclose that Alteryx that had been pushing discounted rates to customers offered longer term deals as part of the "rip-and-replace" front-loading scheme.

58.   Additionally, during the earnings call, Rubin maintained that there "wasn't anything unique"  about the divergence between billings and revenue growth:

> DERRICK WOOD: I'll pick up on that topic. So *the spread, Kevin, between reported revenue growth and reported billings growth has really expanded in Q3 and more in Q4*. Sounds like it's mostly due to duration and product mix. But you did make a comment that you have more bookings that have invoices in on January 1. So I guess was there kind of an unusual mix that caused a higher percentage of bookings that didn't get invoiced until January 1 and we should see that in deferred revenue in Q1? Any way to provide some more color on that?

> KEVIN RUBIN: Yes. Thanks, Derrick. So as we've mentioned before, the calculated billings number that I think you're referring to, it has noise in it. One of the dynamics that you described is, in fact, correct. We have contracts that their billing schedule are different, if you will, or fall over into the next quarter. So it does provide a difference in -- between the billings growth calc that you're looking at and the actual revenue growth. We have coterminous contracts where customers are adding on mid-cycle. That often will drive a -- less than an annual billing because you're billing them just through the next period. So there's a number of reasons why those numbers may be different. *There wasn't anything per se in Q4 that was unique* other than, as we've called out both last quarter and this quarter, just the dynamic that we do have a large number of year-end deals that ultimately trigger in January.

> JAMES WOOD: And just to clarify, the 35% to 40% recognized

up front, it was, again, at the high end of that range?

KEVIN RUBIN: I didn't actually provide any color on that in the prepared remarks, but it did skew to the high end of the range.

59.    The statements in ¶58 were materially false or misleading when made, or omitted material facts necessary to make the statements not misleading because Rubin failed to disclose that it was Alteryx pushing existing customers (not the other way around) to enter into longer-term deals at lower rates as part of the rip-and-replace scheme which had caused this divergence between the two metrics.

**B.    Defendants' False And Misleading Statements Disseminated To the Public On February 24, 2020**

60.    On February 24, 2020, Rubin gave a presentation to investors at the JMP Securities Technology Conference. During that presentation, Rubin, in relevant part, stated:

PATRICK D. WALRAVENSI: …to know that there ***is a huge debate going on among investors -- I mean I've had so many calls***, which was, Pat, where is -- we're doing the math, ***we're trying to figure out***, is this a 38% grower? Or is it a 50% grower? You grew 75%, right? So what are sort of the key 2 or 3 points that you feel like you would like to convey to investors at this time? What are the key messages you guys want to get across?

KEVIN RUBIN:  .  .  .  Our revenue is basically bookings-based, essentially. ***Product mix has some influence on how much of our revenue gets recognized upfront versus over time. But that's probably not the largest driver***. And then bookings, of course, are influenced by the duration of the contracts that we enter into, which are typically 1-year contracts and/or 3-year contracts. We have done more and more coterminal contracts. So as customers that may have multiyear contracts in place with us go through expansion and upgrades. We will often co-term those interim period contracts to their kind of standard renewal period. ***So the real fundamental question is, if you don't believe revenue growth is indicative of kind of a normalized growth rate then what is the next best metric? We don't necessarily think billings are. It's a noisy metric.*** It's subject to the underlying contracts that we enter into. So then I would defer to looking at bookings.

Contract duration has been, on average, 2 years going back to 2015. So pretty stable over a long period of time. And as we reported for the most recent year, 2019, the duration averaged exactly 2.0.

WALRAVENSI So the key point is, look at...

KEVIN RUBIN: Look, I still think, at the end of the day, revenue is...

WALRAVENSI Look at revenue, Pat.

61.    The statements in ¶60 were materially false or misleading when made, or omitted material facts necessary to make the statements not misleading because Rubin failed to disclose that it was Alteryx pushing existing customers to enter into longer-term deals at lower rates as part of the rip-and-replace scheme.

**C.    Defendants' False And Misleading Statements Disseminated To the Public On May 6, 2020**

62.    On May 6, 2020, the Company issued a press release entitled, "Alteryx Announces First Quarter 2020 Financial Results."   Therein, the Company, in relevant part, stated:

Alteryx, Inc. (NYSE: AYX), revolutionizing business through data science and analytics, today announced financial results for its first quarter ended March 31, 2020.

"Alteryx delivered solid results and crossed over $400 million in annual recurring revenue in the first quarter, despite an abrupt and significant change in customer buying behavior late in the quarter," said Dean Stoecker, CEO of Alteryx, Inc. "In these challenging times, we believe the importance of data has never been greater, and we remain focused on and committed to helping our customers leverage data to better navigate these circumstances."

\***

- **Revenue:** Revenue for the first quarter of 2020 was $108.8 million, an increase of 43%, compared to revenue of $76.0 million in the first quarter of 2019.

***

**Financial Outlook**

As of May 6, 2020, we are providing guidance for the second quarter of 2020 as described below. Given uncertainties related to the ongoing novel coronavirus and coronavirus disease, or COVID-19 pandemic, and rapidly changing global economic environment, we are withdrawing our previously issued full-year 2020 guidance provided on February 13, 2020.

**Second Quarter 2020 Guidance:**

- Revenue is expected to be in the range of $91.0 million to $95.0 million, an increase of 10% to 15% year-over-year.

63. The statements in ¶62 were materially misleading when made because they omitted the following material facts necessary to make the statements not misleading: (a) that the Company was engaged in the rip-and-replace scheme to pull future revenue into earlier reporting periods, which cannibalized long-term growth for short-term profits and created a revenue cliff for the Company in the foreseeable future; and (b) undisclosed risks to future revenue from the rip-and-replace scheme made the Company's financial guidance unreasonable and without basis. Additionally, the statements in ¶62 regarding ARR were materially misleading when made because they omitted that the Company's ARR included adoption licenses that are short-term contracts that are not intended to recur in the future.

64. On May 6, 2020, the Company held a conference call with analysts and investors to discuss its 2020 first quarter financial results. Therein, Defendant Stoecker, in relevant part, stated:

Despite the abrupt slowdown we saw in March, which I will discuss further in a moment, Q1 results were solid. ***Revenue was $109 million, an increase of 43% year-over-year, driven by a favorable product mix, resulting in the upfront portion of revenue recognition being at the high end of the range and an average contract duration of approximately 2 years, consistent with prior periods***….

***

Now turning to our outlook. The current macroeconomic environment is clearly in a state of turmoil, and we expect it will continue to negatively impact our business. Given the evolving situation with COVID-19 and the increased uncertainty it has created for businesses across the globe, at the present time, we cannot reasonably predict the impact on our full year 2020 financial results. As a result, we are withdrawing our previous full year guidance and do not intend to provide financial guidance for the full year 2020 at this time. ***However, based on the Q2 quarter-to-date activity, coupled with the ratable portion of our revenue that will be recognized in Q2, we believe we have sufficient visibility to provide Q2 guidance for revenue, operating income and EPS.*** For Q2, nearly 2/3 of our revenue will be recognized from deferred revenue and scheduled multiyear billings, approximately 15% is expected from contract renewals, and the remainder will be generated from net new business closed in the quarter. We have historically seen between 80% and 85% of in-period bookings coming from existing customers, which is generally in line with what we saw in the first quarter.

***

In summary, while we are in unprecedented times, we believe Alteryx remains well positioned given our strong product market fit, significant market opportunity given the low penetration into our total addressable market, powerful business model capable of delivering strong levels of profitability and operating cash flow, and our solid financial position with approximately $1 billion of cash on the balance sheet. We have demonstrated the financial discipline of balancing investment for growth while maintaining profitability. We plan to continue to manage our cost structure based on top line dynamics in line with historical levels of profitability.

65.    The statements in ¶64 were materially misleading when made because they omitted the following material facts necessary to make the statements not misleading: (a) that the Company was engaged in the rip-and-replace scheme to pull future revenue into earlier reporting periods, which cannibalized long-term growth

for short-term profits and created a revenue cliff for the Company in the foreseeable future; and (b) undisclosed risks to future revenue from the rip-and-replace scheme made the Company's financial guidance unreasonable and without basis.

66.    Moreover, in response to a question from an analyst, Defendant Rubin in relevant part stated:

TYLER MAVERICK RADKE, SENIOR ASSOCIATE, CITIGROUP INC, RESEARCH DIVISION: Hope you are all staying safe and healthy*. I wanted to follow-up on just trying to better unpack the guidance here for the second quarter, because I think obviously, that was -- that came in a lot lower than people were expecting. I guess, given that you have seen kind of business trends in April in line with maybe where things were last year, I mean, I guess what's the reason why you expect, I guess, the bookings pattern to be so severe? And then I would just love to better understand any more -- better understand the framework around duration?* I know about 2 years is what you said, Kevin, but maybe if you could just help us understand if you're expecting duration to be a headwind in the second quarter so we could better understand the moving pieces associated with the revenue guidance?

DEAN A. STOECKER: Tyler, Dean. I'll let Kevin follow-up with some comments. But just as a reminder to everyone on the call, there's really kind of 2 factors at play. One is, while we are completely subscription-based, we are not 100% ratable. And so we don't have perfect visibility into the entire run rate. We've got visibility into roughly 60%, 65% from the balance sheet. And as an analytics company, the second part of this is, if you put bad data in, you get bad data out. And so we leverage our own platform on all of the KPIs that will indicate when things might change for us. We still don't have all the information that would give us better visibility. And I think that the April performance is actually fairly strong. We've always been conservative, even though we've seen some glimmers of hope in April. It turns out, of the logos we brought in, in April, 35% of them were actually in the highly impacted verticals. That's also some silver lining in this. But as you know, we've been fairly conservative. Kevin?

KEVIN RUBIN: Yes. Thanks, Tyler. Just a couple of things. I think to Dean's point, given that we don't have front portion to our revenue, there is a heightened impact in the current environment to that. *We also*

*have typically seen our quarters back-end loaded in the sense that we do more business in the third month of the quarter than we tend to do early in the quarter. So based on our visibility, guidance is what we can reasonably see as we sit here today. And then finally, your question with respect to duration, we've actually not really seen a material shift in duration either in Q1 nor in the beginning of Q2.* So I would not describe duration as a headwind at the moment.

67.    The statements in ¶66 were materially misleading when made because they omitted the following material facts necessary to make the statements not misleading: (a) that the Company was engaged in the rip-and-replace scheme to pull future revenue into earlier reporting periods, which cannibalized long-term growth for short-term profits and created a revenue cliff for the Company in the foreseeable future; and (b) undisclosed risks to future revenue from the rip-and-replace scheme made the Company's financial guidance unreasonable and without basis.

## VI.    LOSS CAUSATION

68.    During the Class Period, Plaintiffs and the Class purchased Alteryx's securities at artificially inflated prices and were damaged thereby.  The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed or materialized, causing investors' losses.

69.    Defendants' wrongful conduct, alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class. Defendants' misrepresentations and omissions caused and maintained the artificial inflation in Alteryx's stock price throughout the Class Period until Defendants began to disclose the truth regarding the Company's financial condition to the market.

70.    The truth regarding Alteryx's financial condition and/or the true status of the Company's revenue and sales was partially revealed, and/or the concealed risks materialized, on or about: May 6, 2020, August 6, 2020 and August 7, 2020.

71.    On May 6, 2020, the Company issued a press release entitled, "Alteryx Announces First Quarter 2020 Financial Results."   Therein, the Company, in relevant part, stated:

> Alteryx, Inc. (NYSE: AYX), revolutionizing business through data science and analytics, today announced financial results for its first quarter ended March 31, 2020.
>
> "Alteryx delivered solid results and crossed over $400 million in annual recurring revenue in the first quarter, despite an abrupt and significant change in customer buying behavior late in the quarter," said Dean Stoecker, CEO of Alteryx, Inc. "In these challenging times, we believe the importance of data has never been greater, and we remain focused on and committed to helping our customers leverage data to better navigate these circumstances."
>
> ***
>
> - **Revenue:** Revenue for the first quarter of 2020 was $108.8 million, an increase of 43%, compared to revenue of $76.0 million in the first quarter of 2019.
>
> ***
>
> **Financial Outlook**
>
> As of May 6, 2020, we are providing guidance for the second quarter of 2020 as described below. Given uncertainties related to the ongoing novel coronavirus and coronavirus disease, or COVID-19 pandemic, and rapidly changing global economic environment, we are withdrawing our previously issued full-year 2020 guidance provided on February 13, 2020.
>
> - **Second Quarter 2020 Guidance:**
>
> - Revenue is expected to be in the range of $91.0 million to $95.0 million, an increase of 10% to 15% year-over-year.

72.    The flagging forward revenue growth disclosed in the Company's May 6, 2020 earnings release partially informed the market of the revenue cliff created by

Defendants' "rip and replace" front-loading scheme and adoption license practices, and was a materialization of the risks concealed by those undisclosed practices. The Company's share price fell $3.54, or 2.9%, to close at $118.96 per share on May 7, 2020, on heavy trading volume.

73.   On August 6, 2020, after the market closed, the Company issued a press release entitled, "Alteryx Announces Second Quarter 2020 Financial Results." Therein, the Company, in relevant part, stated:

**Second Quarter 2020 Financial Highlights**

- **Revenue**: Revenue for the second quarter of 2020 was $96.2 million, an increase of 17%, compared to revenue of $82.0 million in the second quarter of 2019.

***

- Ended the quarter with over $430.0 million in annual recurring revenue (ARR), an increase of over 40% year-over-year.

***

**Financial Outlook**

As of August 6, 2020, we are providing guidance for the third quarter of 2020 and full year 2020 based on current market conditions and expectations. We emphasize that the guidance is subject to various important cautionary factors referenced in the section entitled "Forward-Looking Statements" below, including risks and uncertainties associated with the COVID-19 pandemic. In addition, we also note that many of our customers are now operating under very challenging circumstances, especially those in industries highly impacted by the COVID-19 pandemic, and may re-evaluate their spend. The guidance we are providing today factors in the expected impacts of the COVID-19 pandemic based on information available to us today. Our guidance is also based on the assumption that significant headwinds will generally continue in the third and fourth quarters of 2020 and there will be uncertainty around new business and renewal timing or billings terms, particularly with customers in these highly impacted industries.

Significant variation from these assumptions could cause us to modify our guidance higher or lower.

**Third Quarter 2020 Guidance:**

- Revenue is expected to be in the range of $111.0 million to $115.0 million, an increase of 7% to 11% year-over-year.

\*\*\*

**Full Year 2020 Guidance:**

- Revenue is expected to be in the range of $460.0 million to $465.0 million, an increase of 10% to 11% year-over-year.
- Annual recurring revenue is expected to be approximately $500.0 million as of December 31, 2020, an increase of over 30% year-over-year.

74. On this news, the Company's stock price fell $47.62, or more than 28%, to close at $121.38 per share on August 7, 2020, on unusually heavy trading volume.

75. On August 7, 2020, after the market closed, Alteryx filed its quarterly report on Form 10-Q with the SEC, in which it further disclosed that the Company "experienced a decrease in revenue from the three months ended June 30, 2020 as compared to the three months ended March 31, 2020 and deterioration in near-term demand. . . ." It also stated that the "decrease in subscription-based software license revenue . . . was primarily due to a decrease in sales to new and existing customers and average transaction size[.]"

76. Alteryx's revenue miss and explanation revealed that its revenue had been front-loaded, and was a materialization of the risks concealed by the misrepresentations and omissions alleged herein. The August 7, 2020 disclosures, coupled with the news from the prior day, resulted in the Company's stock price declining $12.15, or 10%, to close at $109.23 per share on August 10, 2020, on unusually heavy trading volume.

77.   During the Class Period, Plaintiffs and the Class purchased Alteryx securities at artificially inflated prices and were damaged thereby.  The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## VII.   ADDITIONAL SCIENTER ALLEGATIONS

78.   The Individual Defendants acted with scienter by virtue of: (a) their receipt of information reflecting the rip-and-replace scheme; (b) their intentional issuance of material misleading statements regarding the Company's revenue and sales practices; and/or (c) their ultimate responsibility to ensure the accuracy of such statements and their reckless failure to do so.  The Individual Defendants knew or were deliberately reckless in disregarding the materially false or misleading nature of the information they caused to be disseminated to the investing public.

79.   The Individual Defendants also knew or were deliberately reckless in disregarding that the material misrepresentations and omissions contained in the Company's public statements would adversely affect the integrity of the market for the Company's securities and would cause the price of such securities to be artificially inflated.   The Individual Defendants acted knowingly or in such a deliberately reckless manner as to constitute a fraud upon Plaintiff and the Class.

### A.   The Individual Defendants Profited Handsomely From Selling Alteryx Shares At Inflated Prices

80.   Individual Defendants exploited the false appearance of revenue growth created by their rip-and-replace scheme to sell Alteryx stock at inflated prices for absolutely tremendous personal gains.  For example, from the beginning of 2019, the two Individual Defendants have sold more than 1 million shares of stock for more than $120 million dollars in proceeds:

|  | Total Gross Shares Sold | Total Gross Proceeds |
|---|---|---|
| Stoecker | -539,467 | $71,201,799 |
| Rubin | -469,009 | $49,104,089 |
| **Combined** | **-1,008,476** | **$120,305,888** |

81.     And not even close to all these insider sales were the result of automatic pre-set Rule 10b5-1 plans.  In fact, more than one-third were the result of trading on the open market:

|  | Shares Sold On Open Market | Total Gross Proceeds |
|---|---|---|
| Stoecker | -279,219 | $39,356,193 |
| Rubin | -119,183 | $8,723,721 |
| **Combined** | **-398,402** | **$48,079,914** |

82.     Likewise, the Individual Defendants' Class Period stock sales resulting in tremendous financial windfalls.  Stoecker made almost ***$53 million*** and Rubin almost ***$20 million*** in the ***two quarters at issue***:

|  | Total Gross Shares Sold | Total Gross Proceeds |
|---|---|---|
| Stoecker | -382,930 | $52,978,704 |
| Rubin | -135,602 | $19,668,881 |
| **Combined** | **-518,532** | **$72,647,585** |

83.     During the Class Period, more than half of Stoecker's transaction were on the open market and were not Rule 10b5-1 plan transactions:

|  | Shares Sold On Open Market | Total Gross Proceeds |
|---|---|---|
| **Stoecker** | **-202,930** | **$29,381,531** |

84.    These tens of millions of dollars provided a very real incentive for the Individual Defendants to conceal the scheme to rip and replace.  Disclosing the truth would have called into question Alteryx's growth story and cost themselves and the Company's other executives and directors the opportunity to sell hundreds of millions of dollars' worth of personal holdings at inflated prices.

**B.    Longstanding Executives Directly Involved In The Scheme Were Removed From Their Position Following Its Disclosure And Company Only Revealed ARR After The CEO's Removal**

85.    Defendant Stoecker was one of the co-founders of Alteryx in 1997 and served as its CEO from its founding.  Following the Class Period, on October 5, 2020, the Company announced that after almost 24 years as CEO, Stoecker had resigned on October 2, 2020 and was replaced by one of the Company's directors, Mark Anderson.

86.    Thereafter, one month after Stoecker's resignation, on November 5, 2020, the Company finally disclosed its ARR for every quarter, enabling investors to calculate both year-over-year and sequential ARR growth over time, and compare that to revenue growth, which as discussed above, demonstrated that the revenue was inflated by the rip-and-replace scheme.

87.    Soon thereafter, on January 4, 2021, Alteryx's Chief Revenue Officer, Scott Jones, who had been at the Company in that position since February 2017, also left the Company "to pursue outside opportunities."  He was replaced by Dean Darwin that same day.  In the press release announcing Darwin's appointment, the Company described the position as reporting directly to the CEO and to "lead the global go-to-market (GTM) organization, including worldwide sales, channels and all industry-specific GTM initiatives."

88.    The most logical inference from the departure of long-serving executives, including the leader who oversaw worldwide sales, both of whom were certainly directly involved in the Company's revenue scheme, is that they knew (or

at the very least deliberately ignored), that the Company's revenue disclosures were misleading due to the revenue scheme.   Moreover, the fact that Alteryx only disclosed its ARR after Defendant Stoecker was replaced is further indicative of his knowledge of, or recklessness in not knowing about, the scheme.

## C.     Alteryx's Sales Of Its Web Services Were The Company's Core Operations

89.    Alteryx's software service platform subscription sales is the core operations of the Company.   Moreover, the figures at issue—sales revenue and sustained growth—were the most important metrics for the market to assess the Company's prospects owing to the Company's growth narrative.   In fact, during earnings calls and other conferences, the Individual Defendants were specifically and repeatedly asked about revenue and growth rates.   For example, Rubin was directly asked about what the "real" growth rate at Alteryx by an analyst at JMP securities following the Company at the start of the Class Period ("there is a huge debate going on among investors -- I mean I've had so many calls, which was, Pat, where is -- we're doing the math, we're trying to figure out, is this a 38% grower? Or is it a 50% grower? You grew 75%, right? So what are sort of the key 2 or 3 points that you feel like you would like to convey to investors at this time?").

90.    The Individual Defendants were aware of the details of Company's sales practices and corresponding revenue and revenue growth; or if the Company's CEO and CFO were unaware, their ignorance constitutes acting in such a deliberately reckless manner as to constitute a fraud and deceit upon Plaintiffs and other Class members.   In either case, the only reasonable inference is that the Individual Defendants acted with scienter in concealing the Company's sales practices and its resulting impact on Alteryx.   Additionally, this inference is further supported by the fact that the Individual Defendants were specifically and repeatedly asked and responded to detailed questions about these issues as detailed above.

**D.      The Company's Accounting Firm Is Replaced Just As The Accounting Rule Changes That Enable Defendants' Scheme Come Into Effect**

91.      In January 2019, Alteryx dismissed its auditor, Pricewaterhouse Coopers LLC ("PwC") and engaged Deloitte & Touche LLP ("Deloitte") in PwC's place.   This dismissal occurred around the same time that Alteryx switched accounting methods and it appears the scheme began.

**E.      CORPORATE SCIENTER ALLEGATIONS**

92.      Each of the Individual Defendants was a high-ranking management-level employee.  The scienter of each of the Individual Defendants and of all other management-level employees of Alteryx, including each high-ranking officer or director, is imputable to Alteryx.  The knowledge of each of these individuals should therefore be imputed to the Company for the purposes of assessing corporate scienter.

93.      Even aside from the scienter of the Individual Defendants, the facts alleged herein raise a strong inference of corporate scienter as to Alteryx as an entity.  Corporate scienter may be alleged independent of individual defendants where a statement would have been approved by corporate officials sufficiently knowledgeable about the company to know the statement was false.  Here, the statements alleged were made to the investing public regarding the Company's finances, business practices and growth—all important topics that would necessarily require approval by appropriate corporate officers who, as alleged, had very different information in their hands at the time from what was disclosed to the investor.

**VIII.  CLASS ACTION ALLEGATIONS**

94.      Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of the Class, consisting of all individuals and entities that purchased or acquired Alteryx securities between February 13, 2020

and August 7, 2020, inclusive, seeking remedies under Sections 10(b) and 20(a) of the Exchange Act.   Excluded from the Class are Defendants, the officers and directors of the Company (at all relevant times), members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

95.   The members of the Class are so numerous that joinder of all members is impracticable.   Throughout the Class Period, Alteryx's shares were actively traded on the NYSE.   While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class.   Millions of Alteryx shares were traded publicly during the Class Period on the NYSE.   As of April 30, 2020, Alteryx had 52,972,514 shares of Class A common stock outstanding and 12,988,715 shares of Class B common stock outstanding.   Record owners and other members of the Class may be identified from records maintained by Alteryx or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

96.   Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

97.   Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action and securities litigation.

98.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.   Among the questions of law and fact common to the Class are:

a.   whether the federal securities laws were violated by Defendants' acts as alleged herein;

b.      whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Alteryx;

c.      whether Defendants knew or deliberately disregarded that their statements were false and misleading;

d.      whether the price of Alteryx securities was artificially inflated because of Defendants' conduct complained of herein; and

e.      to what extent the members of the Class have sustained damages and the proper measure of damages.

99.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs complained of herein.  Moreover, there will be no difficulty in the management of this action as a class action.

## IX.   UNDISCLOSED ADVERSE FACTS

100.   The market for Alteryx's shares was open, well-developed and efficient at all relevant times.   As a result of these materially false and/or misleading statements, and/or failures to disclose, Alteryx's shares traded at artificially inflated prices during the Class Period.  Plaintiffs and other members of the Class purchased or otherwise acquired Alteryx's securities relying upon the integrity of the market price of the Company's securities and market information relating to Alteryx, and have been damaged thereby.

101. During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Alteryx's securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading.  Said

statements and omissions were materially false and/or misleading in that they failed to disclose material adverse information and/or misrepresented the truth about Alteryx's business, operations, and prospects as alleged herein.

102. At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiffs and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Alteryx's financial well-being and prospects.  These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times.  Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiffs and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein.

X.   **APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD- ON-THE-MARKET DOCTRINE)**

103.  The market for Alteryx's shares was open, well-developed, and efficient at all relevant times.  As a result of the materially false and/or misleading statements and/or failures to disclose, Alteryx's securities traded at artificially inflated prices during the Class Period.  On July 9, 2020, the Company's shares closed at a Class Period high of $181.98 per share.  Plaintiffs and other members of the Class purchased or otherwise acquired the Company's shares relying upon the integrity of the market price of Alteryx's shares and market information relating to Alteryx, and have been damaged thereby.

104.  During the Class Period, the artificial inflation of Alteryx's stock was caused by the material misrepresentations and/or omissions particularized in this

Complaint, which in turn caused the damages sustained by Plaintiffs and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements and/or omissions about Alteryx's business, prospects, and operations.  These material misstatements and/or omissions created an unrealistically positive assessment of Alteryx and its business, operations, and prospects, thus causing the price of the Company's shares to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company's shares. Defendants' materially false and/or misleading statements and/or omissions during the Class Period resulted in Plaintiffs and other members of the Class purchasing the Company's shares at such artificially inflated prices, and each of them has been damaged as a result.

105. At all relevant times, the market for Alteryx's shares was an efficient market for the following reasons, among others:

a.     Alteryx stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

b.     As a regulated issuer, Alteryx filed periodic public reports with the SEC and/or the NYSE;

c.     Alteryx regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

d.     Alteryx was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports were publicly available and entered the public marketplace; and/or

e.      The average daily trading volume for Alteryx stock during the Class Period was 1,860,637 shares, with more than 52,972,514 shares of Class A common stock outstanding and 12,988,715 shares of Class B common stock outstanding as of April 30, 2020, and a market capitalization reaching just over $18 billon during the Class Period.

106.  As a result of the foregoing, the market for Alteryx's shares promptly digested current information regarding Alteryx from all publicly available sources and reflected such information in Alteryx's stock price.  Under these circumstances, all purchasers of Alteryx's shares during the Class Period suffered similar injury through their purchase of Alteryx's securities at artificially inflated prices and a presumption of reliance applies.

107.  A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. U.S.*, 406 U.S. 128 (1972), because the Class' claims are, in large part, grounded on Defendants' material misrepresentations and/or omissions.   Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## XI.   INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE

108.  The statutory safe harbor and/or bespeaks caution doctrine applicable to forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint.

109.  The statements alleged to be false and misleading herein all relate to

then-existing facts and conditions.   In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and/or there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

110. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time of each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Alteryx knowing that the statement was false or misleading when made.

## XII.   CLAIMS

### FIRST CLAIM
### Violations of Section 10(b) of the Exchange Act and
### Rule 10b-5 Promulgated Thereunder
### <u>Against All Defendants</u>

111.  Plaintiffs repeat and re-allege each allegation contained above as if fully set forth herein.

112. This claim is asserted against all Defendants and is based on Section 10(b) of the Exchange Act.

113. During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; and (ii) cause Plaintiffs and other members of the Class to purchase Alteryx's shares at artificially inflated prices.   In furtherance of this unlawful scheme, plan and course of conduct, Defendants took the actions set forth herein.

114. Defendants (i) employed devices, schemes, and artifices to defraud; (ii)

made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's shares in an effort to maintain artificially high market prices for Alteryx's shares in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants were either primary participants in the wrongful and illegal conduct charged herein or were controlling persons as alleged below.

115. Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Alteryx's financial well-being and prospects, as specified herein.

116. Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Alteryx's value and performance and continued growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Alteryx and its business operations and prospects, in light of the circumstances under which they were made, not misleading, and engaged in transactions, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's shares during the Class Period.

117. Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of the Individual Defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans,

projections and/or reports; (iii) each of the Individual Defendants enjoyed significant personal contact and familiarity with the other Individual Defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, and operations at all relevant times; and (iv) each of the Individual Defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

118. Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Alteryx's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities.  As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

119. Because of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Alteryx's shares was artificially inflated during the Class Period.  In ignorance of the fact that the market price of the Company's shares was artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the shares traded, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, and not disclosed in public during the Class

Period, Plaintiffs and the other members of the Class acquired Alteryx's shares during the Class Period at artificially high prices, and were damaged thereby.

120. At the time of said misrepresentations and/or omissions, Plaintiffs and other members of the Class were ignorant of their falsity and believed them to be true. Had Plaintiffs and the other members of the Class and the marketplace known the truth regarding the Company's misrepresentations, which were not disclosed by Defendants, Plaintiffs and other members of the Class would not have purchased or otherwise acquired their Alteryx shares, or, if they had acquired such shares during the Class Period, they would not have done so at the artificially inflated prices which they paid.

121. Because of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

122. As a direct and proximate result of the Section 10(b) Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and acquisitions of Alteryx securities during the Class Period.

**SECOND CLAIM**
**Violations of Section 20(a) of the Exchange Act**
**Against the Individual Defendants**

123. Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

124. This claim is asserted against the Individual Defendants and is based on Section 20(a) of the Exchange Act.

125. The Individual Defendants acted as controlling persons of Alteryx within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and

disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading. The Individual Defendants were provided with, or had unlimited access to, copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

126. In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular statements giving rise to the securities law violations as alleged herein and exercised the same.

127. As set forth above, Alteryx and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and/or omissions as alleged in this Complaint. Because of their positions as controlling persons, the Individual Defendants are thus liable pursuant to Section 20(a) of the Exchange Act for Alteryx's primary Exchange Act Section 10(b) violations. As a direct and proximate result of the Individual Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's Shares during the Class Period.

## XIII. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

(a)    A determination that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)    An award of compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages

sustained due to Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)     An award to Plaintiffs and the Class of their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

(d)     Such other and further relief as the Court may deem just and proper.

## XIV.  JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated: January 28, 2021                    Respectfully submitted,

**GLANCY PRONGAY & MURRAY LLP**

By:  *s/ Casey E. Sadler*
Robert V. Prongay
Casey E. Sadler
Raymond D. Sulentic
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile:  (310) 201-9160
Email:         rprongay@glancylaw.com
                    csadler@glancylaw.com
                    rsulentic@glancylaw.com

**POMERANTZ LLP**
Joshua B. Silverman
Michael Krzywicki
10 South LaSalle Street, Suite 3505
Chicago, Illinois  60603
Telephone: (312) 377-1181

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Jennifer Patifi
100 Glendon Avenue, 15th Floor
Los Angeles, California 90024
Telephone: (310) 405-7190

*Counsel for Alejandro Handal, Steven
Cardoza, and Homayon Farnoodymeher and
Lead Counsel for the Class*

**THE LAW OFFICES OF FRANK R.
CRUZ**
Frank R. Cruz (SBN 216587)
1999 Avenue of the Stars, Suite 1100
Los Angeles, CA 90067
Telephone: (310) 914-5007
Email: fcruz@frankcruzlaw.com

**THE SCHALL LAW FIRM**
Brian Schall
2049 Century Park East, Suite 2460
Los Angeles, California 90067
Telephone: (424) 303-1964
Facsmile: (877) 590-0482
Email: brian@schallfirm.com

*Additional Counsel*

## <u>PROOF OF SERVICE BY ELECTRONIC POSTING</u>

I, the undersigned say:

I am not a party to the above case and am over eighteen years old.   On January 28, 2021, I served true and correct copies of the foregoing document, by posting the document electronically to the ECF website of the United States District Court for the Central District of California, for receipt electronically by the parties listed on the Court's Service List.

I affirm under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on January 28, 2021 at Los Angeles, California.


                                        *s/ Casey E. Sadler*
                                        Casey E. Sadler